UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

DIANNE KNOX; WILLIAM L.
BLAYLOCK; ROBERT A. CONOVER;
EDWARD L. DOBROWOLSKI, JR.;
KARYN GIL; THOMAS JACOB HASS;
PATRICK JOHNSON; and JON JUMPER,
On Behalf of Themselves and the
Class They Seek to Represent,

      Plaintiffs,

    v.

STEVE WESTLY, Controller,
State of California; and
CALIFORNIA STATE EMPLOYEES
ASSOCIATION, LOCAL 1000,
SERVICE EMPLOYEES
INTERNATIONAL UNION, AFL-CIO-
CLC,

      Defendants.

No. 2:05-cv-02198-MCE-KJM

MEMORANDUM AND ORDER

----oo0oo----

///

///

///

1

Through the present action, Plaintiffs, state employees, seek redress against Defendants, Steve Westly, the Controller of the State of California ("Controller"), and California State Employees Association, Local 1000, Service Employees International Union, AFL-CIO, CLC ("the Union"), for violations of their First, Fifth, and Fourteenth Amendment rights under 42 U.S.C. § 1983 by, *inter alia*, using Plaintiffs' monies to support political causes without satisfying constitutionally required procedural safeguards as compelled by Chicago Teachers Union v. Hudson, 475 U.S. 292 (1986).

Plaintiffs seek Summary Judgment as to the case in its entirety, or, alternatively, Summary Adjudication of individual claims, arguing that Defendants failed to provide any notice to employees regarding the basis for the temporary assessment imposed by the Union from September 2005 through December of 2006. Defendants filed a cross-motion seeking Partial Summary Judgment as to the nonobjecting class of Plaintiffs, arguing that those Plaintiffs consented to the use of their wages to fund the Union's temporary assessement when they failed to object after receiving the Union's annual <u>Hudson</u> notice. Defendants also ask that this Court grant Summary Adjudication limiting the relevant time period of Plaintiffs' claims to September 2005 through June 2006 (inclusive). For the reasons set forth below, Plaintiffs' Motion is granted, and Defendants' Motion is granted in part and denied in part.[1]

*///*

---

[1] Because it is determined that oral argument would not be of material assistance, the Court ordered this matter submitted on the briefing. E.D. Cal. Local Rule 78-230(h).

1

**BACKGROUND**

2

3       Though the following underlying facts material to the

4  disposition of this Motion are undisputed, the Court is aware

5  that the parties' characterizations of those facts diverge

6  greatly.

7       Plaintiffs represent two classes of nonunion employees,

8  those who objected to the Union's June 2005 Hudson Notice

9  ("objectors") and those who did not ("nonobjectors")

10  (collectively "Plaintiffs").  See Pls.' Statement of Undisputed

11  Material Facts and Defs.' Response Thereto, No. 11 ("UF").

12  Defendants are the State Controller and the Union.  Id., Nos. 8-

13  9.

14       The State of California has recognized the Union as the

15  exclusive bargaining agent for the Plaintiffs and other State

16  employees in bargaining units designated as Bargaining Units 1,

17  3, 4, 11, 14, 15, 17, 20, and 21.  Id., No. 16.  The Union and

18  the State of California have entered a series of Memoranda of

19  Understanding ("MOUs") controlling the terms and conditions of

20  employment for Plaintiffs.  Id.  One such MOU includes a

21  provision requiring that all State employees in these Bargaining

22  Units join the Union as formal Union members, or if opting not to

23  join, have deducted from their wages a proportionate amount of

24  agency fees.  Id., No. 17.

25       The Union issues a notice pursuant to Hudson every June.

26  This constitutionally required "Hudson notice" is meant to

27  provide nonmembers with, *inter alia*, an adequate explanation of

28  the basis of the agency fee.  Hudson at 310.

3

Additionally the notice provides that, for thirty (30) days after it is issued, nonunion employees can object to the collection of full union dues and can elect instead to have only the reduced rate deducted during the upcoming fee year.  Finally, during that 30-day period, nonmembers can also challenge the Union's calculation of its chargeable and nonchargeable expenses.  Such challenges are resolved by an impartial decisionmaker.  UF, No. 18.

In June, 2005, the Union issued its annual Hudson notice ("2005 Hudson Notice").  This notice did not indicate that a temporary assessment would be included in the 2005-06 dues and fees, but stated that "[d]ues are subject to change without further notice to fee payers."  Id., No. 27.

The 2005 Hudson Notice set the agency fee to be deducted from nonunion employee paychecks for the 2005-06 fiscal year at 99.1% of dues.  That Notice also informed nonmembers that the reduced agency fee ("fair share fee") of 56.35% of the Union's annual dues, would be charged to nonmembers who objected to paying the full agency fee and who requested a rebate pursuant to the procedures and deadlines outlined in the Notice.  The 56.35% was based on the Union's actual expenditures for the year ending December 31, 2004, in which the Union calculated chargeable expenditures to be 56.35% of its total expenditures.  Id., No. 28.

///

///

///

///

4

On July 30, 2005, the Union proposed an "Emergency Temporary Assessment to Build a Political Fight-Back Fund" ("Assessment") for "use for a broad range of political expenses, including television and radio advertising, direct mail, voter registration, voter education, and get out the vote activities in our work sites and in our communities across California," specifically stating that "[t]he Fund will not be used for regular costs of the union – such as office rent, staff salaries or routine equipment replacement, etc." Id., No. 20. Additionally, the Union claimed that the Assessment was to "be used specifically in the political arenas of California to defend and advance the interests of members of the Union and the important public services they provide."[2] This Assessment was expected to raise $12 million for the Union. Id., No. 23. On August 27, 2005, Union delegates to the CSEA General Council voted to implement the temporary dues increase of one-fourth of one percent of salary to create this "Political Fight Back Fund." Id., No. 22.

///

///

///

///

---

[2] The Court notes Defendants' assertion that the Assessment was actually used "for a broad variety of expenditures, many of which were for chargeable activities." As is discussed, *infra*, this is not material to the disposition of this Motion. Additionally, the Court is cognizant of Defendants' position that none of their publications at the time the Assessment was adopted actually stated that the Assessment would be used "exclusively" for purposes set forth in those quotations or "exclusively" for nonchargeable expenditures. This, too, is immaterial to the Court's disposition of the current Motion.

1   On August 31, 2005, the Union sent another letter, addressed
2   to "Local 1000 Members and Fair Share Fee Payers."  The letter
3   stated that Union members were subject to a dues increase and
4   that "[t]he $45 per month cap on...regular dues of 1% of gross
5   pay [would] continue in effect, but [would] not apply to this
6   additional .0025 temporary increase."  Id., No. 29.  That letter
7   also claimed that the Union would use the funds from the
8   Assessment to "defeat Proposition 76 and Proposition 75 on
9   November 8."  Additionally, according to the Union, it intended
10  to "defeat another attack on [its] pension plan" in June of 2006,
11  and  "[i]n November 2006, [it would] need to elect a governor and
12  a legislature who support public employees and the services
13  [they] provide."  Compl., Exh. D.

14      After receiving this letter, Plaintiff Dobrowolski called
15  the Union's Sacramento office, and was directed to its Riverside
16  office where he left a message for Jodi Smith, area manager.
17  Smith returned his call and stated that, even if Dobrowolski
18  objected to the payment of the full agency fee, there was nothing
19  he could do about the September increase for the Assessment.  She
20  also stated that "we are in the fight of our lives," that the
21  Assessment was needed, and that there was nothing that could be
22  done to stop the Union's expenditure of that Assessment for
23  political purposes.  UF, No. 34.

24      Pursuant to the Assessment, the Controller began deducting
25  additional fees at the end of September, 2005.  Id., No. 31.
26  Plaintiffs subsequently initiated this action in November of that
27  year.
28  ///

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

Rule 56 also allows a court to grant summary adjudication on part of a claim or defense.  See Fed. R. Civ. P. 56(a) ("A party claiming relief may move...for summary judgment on all or part of the claim."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995); France Stone Co., Inc. v. Charter Township of Monroe, 790 F. Supp. 707, 710 (E.D. Mich. 1992).

The standard that applies to a motion for summary adjudication is the same as that which applies to a motion for summary judgment.  See Fed. R. Civ. P. 56(a), 56(c); Mora v. ChemTronics, 16 F. Supp. 2d. 1192, 1200 (S.D. Cal. 1998).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.

Celotex at 323(quoting Rule 56(c)).

///

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

In attempting to establish the existence of this factual dispute, the opposing party must tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Fed. R. Civ. P. 56(e).  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of Western Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987).  Stated another way, "before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."  Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 14 Wall. 442, 448, 20 L.Ed. 867 (1872)).

///

///

///

8

As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 586-87.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

**ANALYSIS**

**I.   PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**A.   The 2005 *Hudson* Notice Did Not Provide an Adequate Explanation of the Basis of the Assessment**

The dispute in this case, while of great import, is over a relatively simple question: Did Defendants' June 2005 <u>Hudson</u> Notice provide "an adequate explanation of the basis" supporting the subsequent September 2005 Assessment?

///

///

///

9

1    This somewhat narrow issue is drawn against a broader

2  backdrop of First Amendment jurisprudence.  There is no question

3  that "[r]equiring nonunion employees to support their collective-

4  bargaining representative 'has an impact upon their First

5  Amendment interests." Hudson at 301 (quoting Abood v. Detroit

6  Bd. of Educ., 431 U.S. 209, 222 (1977)).  Nevertheless, it is

7  constitutional for a "public employer to designate a union as the

8  exclusive collective-bargaining representative of its employees,

9  and to require nonunion employees, as a condition of employment,

10  to pay a fair share of the union's costs of negotiating and

11  administering a collective-bargaining agreement .... [H]owever,

12  ... nonunion employees do have a constitutional right to 'prevent

13  the Union's spending a part of their required service fees to

14  contribute to political candidates and to express political views

15  unrelated to its duties as exclusive bargaining representative.'"

16  Hudson at 301-302 (quoting Abood at 234).  The fees charged to

17  nonunion employees for services related to a union's collective-

18  bargaining activities are termed "fair share" fees.

19    In Hudson, the Supreme Court elaborated "that the

20  constitutional requirements for the Union's collection of agency

21  fees include an adequate explanation of the basis for the fee, a

22  reasonably prompt opportunity to challenge the amount of the fee

23  before an impartial decisionmaker, and an escrow for the amounts

24  reasonably in dispute while such challenges are pending." Hudson

25  at 310.  Notices issued pursuant to this language have come to be

26  known as "Hudson Notices." Wagner v. Prof'l Eng'rs in Cal.

27  Gov't, 354 F.3d 1036, 1039 (9th Cir. 2004).

28  ///

After receiving a Hudson notice, "the nonunion employee has the burden of raising an objection, but ... the union retains the burden of proof" as to the appropriate proportion of fair share fees. Hudson at 306 (citing Abood at 239-240 ("Since the unions possess the facts and records from which the proportion of political to total union expenditures can reasonably be calculated, basic considerations of fairness compel that they, not the individual employees, bear the burden of [proof].")). Additionally, the important policies underlying Hudson inform the determination of whether a Hudson notice is adequate. "Basic considerations of fairness, as well as concern for the First Amendment rights at stake,...dictate that the potential objectors be given sufficient information to gauge the propriety of the union's fee." Hudson at 306. "Leaving the nonunion employees in the dark about the source of the figure for the agency fee-and requiring them to object in order to receive information-does not adequately protect the careful distinctions drawn in [prior case law]." Hudson at 306.

Hudson has been interpreted in later cases as setting the minimum constitutional protections that a union must provide nonunion employees. See Davenport v. Wash. Educ. Ass'n, ___ U.S. ___, 127 S. Ct. 2372, 2379 (2007). Indeed, our Supreme Court has referred to the Hudson requirements as a "constitutional floor." Id.

///

///

///

///

1    To date, only the Northern District of California has had
2    the opportunity to address the Hudson requirements on facts
3    similar to this case.  On two separate occasions that court
4    determined that a union's annual Hudson notice provided adequate
5    information to supply a basis for a newly-imposed, post-objection
6    period, 10% increase in fees and dues.  See Liegmann v. Cal.
7    Teachers Ass'n, 395 F. Supp. 2d 922 (N.D. Cal. 2005) (addressing
8    the question in the context of an application for a Temporary
9    Restraining Order ("TRO")) (Liegmann I); Liegmann v. Cal.
10   Teachers Ass'n, 2006 WL 1795123 (N.D. Cal. 2006) (addressing the
11   issue in the context of cross-motions for summary judgment)
12   (Liegmann II).

13   In Liegmann I, that court was confronted with facts similar
14   to those this Court considers today.  That union issued its
15   annual Hudson notice and subsequently implemented an
16   approximately 10% increase in dues and fair share fees to be used
17   either wholly or partially for political purposes.  Liegmann I at
18   925-927.  Under the standard for reviewing TRO applications, that
19   court had to balance the potential hardships to the parties.
20   Liegmann I at 925.  The court balanced the union's and the
21   nonobjectors' constitutional rights against those of the
22   objectors and determined that the employee plaintiffs had failed
23   to show that the balance tipped in their favor.[3]  Id. at 926.
24   ///

25

26       [3] To the extent the Northern District relied on an apparent
     need to protect the union's constitutional entitlement to
27   nonunion employees' fees, that decision cannot stand.  See
     Davenport v. Washington Education Association, ___ U.S. ___, 127
28   S. Ct. 2372, 2379 (2007).

1   When examining the likelihood of success on the merits, the

2   <u>Liegman I</u> court stated, "This Court declines to find nonmembers

3   are further entitled to another <u>Hudson</u> Notice, in advance,

4   detailing exactly how much of the additional revenue generated by

5   a fee increase will be spent on which purpose.  There is nothing

6   in <u>Hudson</u> or subsequent authority which requires that <u>Hudson</u>

7   Notices provide such advance detail."  <u>Liegmann I</u> at 927.  That

8   court went on to determine that nothing in the facts indicated

9   that the "increase [was] so extraordinary that it require[d] a

10  departure from the procedure approved in <u>Hudson</u>."  <u>Id</u>. at 927.

11  In <u>Liegmann II</u>, the Northern District revisited the same

12  facts in the more developed posture of cross-motions for summary

13  judgment.  As in this case, that union argued, and that court

14  agreed, that the standard <u>Hudson</u> notice provided adequate

15  information regarding the subsequent dues increase.  <u>Liegmann II</u>

16  at *3.  That court further determined that the assessment was not

17  so extraordinary as to warrant a departure from customary <u>Hudson</u>

18  procedures.  Notably, that court did not have before it a case

19  raising the "question of whether an assessment for purely

20  political purposes would necessitate a deviation from <u>Hudson</u>

21  because the facts of [that] case [did] not raise such a

22  question."  <u>Liegmann II</u> at *5.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

1    This Court, too, need only engage in a straight-forward

2    _Hudson_ analysis to determine whether, under traditional

3    principles, the Union's 2005 _Hudson_ Notice was adequate to

4    provide a basis for its Assessment.[4]

5    Critical to the current endeavor, and hotly disputed between

6    the parties, is the characterization of the Assessment.  As a

7    threshold issue, this Court will address the parties'

8    disagreement regarding the actual magnitude of the Assessment's

9    impact.  Plaintiffs state that the Assessment resulted in a 25-

10   35% increase in fees paid by nonmembers.  Defendants, to the

11   contrary, attempt to align their cause with _Liegmann_, where the

12   court addressed a 10% increase in fair share fees, by arguing

13   that current objectors only saw an increase of 14.09%.

14   Defendants reach this conclusion by pointing out that, at least

15   for those who objected to the 2005 _Hudson_ Notice, the only

16   portion of the increase they would be required to pay is 56.35%

17   of the 25% increase, which equates to a 14.09% increase in the

18   deduction from the objector's salary.[5]  This figure is somewhat

19   misleading, however, because it refers only to the increase in

20   the percentage of salary deducted from objectors' wages and not

21   to the percentage increase in fair share fees paid by nonunion

22   employees.

23   ///

---

24

25   [4] Because the Court finds the 2005 _Hudson_ Notice legally
     inadequate under its traditional _Hudson_ analysis, it is not
26   necessary to consider whether the current facts, when compared to
     those in the _Liegmann_ cases, present such an extraordinary set of
27   circumstances as to warrant a departure from _Hudson_.

28   [5] The percentage of salary deducted from nonobjectors
     increased by 24.775% (99.1% x 25%).

Plaintiffs' characterization of the percentage increase in fair share fees is more on point.  Standard dues paid by those objectors earning $4500 per month would be capped at 1% of salary, or $45, per month.  The Assessment was not subject to this cap.  Therefore, someone earning $4500 would be assessed an additional .25% of his or her salary, or $11.25.  Since this person was an objector, he or she would only be required to pay 56.35% of the above union dues.  In this case, that equals an additional $6.34, which is approximately a 14% increase when compared to the $45 monthly dues.  However, objectors would not have paid $45 in union dues.  They would have paid only their pro rata share, 56.35% of $45, which is approximately $25.34.  Therefore, the $6.34 increase actually equates to an increase of approximately 25% in fair share fees.[6]

Additionally, because the standard dues are capped at 1% of salary, and the Assessment was not subject to this cap, those objectors who earned in excess of $4500 per month, would see this proportion grow as their salaries increased.[7]  Therefore, the fair share fees paid by both objectors and nonobjectors actually increased by a much greater margin than Defendants would like to suggest.

---

[6] A nonobjector would see the same increase (99.1% x $45.00 = $44.60; 99.1% x $11.25 = $11.15; $11.15/$44.60 = 25%).

[7] As an example, an objector earing earning $6000 per month would pay only his pro rata share of 1% of his monthly salary, capped at $45, again $25.34.  However, the cap would not limit the amount allocated to him for the Assessment.  Therefore, he would be required to pay his pro rata share of .25% of 1% of his salary, in this case an additional $8.45.  This equates to an increase in his fair share fee of approximately 33%.  A nonobjector earning the same amount would see the same approximate increase.

15

This increase represents a material change in the amount of funds nonunion employees were required to contribute to Union expenditures.

More importantly, however, is a determination of the nature of the Assessment.  Plaintiffs ask the Court to view the Assessment as a fund intended solely for political and ideological purposes.  Defendants disagree and request this Court view it as an ordinary dues and fees increase.  This distinction is relevant because there is no case law directly on point dealing with an assessment intended solely to fund political and ideological goals.  However, this Court finds that the semantic arguments are not dispositive and engages in the current discussion only to clarify its opinion.  Regardless of how the assessment is cast, the Courts' decision is the same.

Based on the Union's own initial characterization of the Assessment, the fund was intended for political purposes.  The Court is cognizant of the fact that, in retrospect, the Union may be able to show that the entire fund was not used for nonchargeable, political or ideological purposes.  Based on that, Defendants appear to argue that if any of the Assessment's funds were spent on chargeable activities, the Assessment should be treated as an ordinary dues and fees increase.  This argument defies logic.

///

///

///

///

///

16

1    First and foremost, the Union specifically couched its
2  proposed assessment as an "Emergency Temporary Assessment to
3  Build a Political Fight-Back Fund" for "use for a broad range of
4  political expenses, including television and radio advertising,
5  direct mail, voter registration, voter education, and get out the
6  vote activities in our work sites and in our communities across
7  California."  Additionally, the Union stated that the fund was
8  not to be used "for regular costs of the union - such as office
9  rent, staff salaries or routine equipment replacement, etc."
10 Rather, it was to "be used specifically in the political arenas
11 of California to defend and advance the interests of members of
12 the Union and the important public services they provide."  See
13 UF, Nos. 20, 23.

14    When employees were officially notified of the Assessment,
15 the Union stated that it intended to use the funds to "defeat
16 Proposition 76 and Proposition 75," to "defeat another attack on
17 [its] pension plan" in June of 2006, and to "elect a governor and
18 a legislature who [would] support public employees and the
19 services [they] provide" in November of 2006.  Id., No 29; See
20 Compl., Exh. D.  It is hard to imagine any circumstances in which
21 it could be more clear that an Assessment was passed for
22 political and ideological purposes.

23    Nevertheless, the Union argues that not all of the funds
24 were used for political purposes, and, even if they were, not all
25 political purposes are nonchargeable. However, the adequacy of
26 Hudson notices should not be viewed through a lens skewed by the
27 benefit of hindsight.
28 ///

The undisputed facts surrounding the implementation of the Assessment evidence that the Union fully intended to use the 12 million additional dollars it anticipated to raise for political purposes. Following the Union's logic, it should be required only to show that some small fraction of this fund was used for chargeable purposes in order to justify subverting its <u>Hudson</u> responsibilities.

Defendants call for the Court to be practical. However, they cannot simultaneously avoid that call for practicality themselves. The Union controls the categorization of its own expenses. Following Defendants' reasoning, there could never exist an assessment for purely political purposes because it is quite likely that some small portion of such a fund would, from a practical perspective, always be chargeable. It would follow that all post-notice, post-objection period assessments would be considered dues and fees increases, covered by an already issued <u>Hudson</u> notice. Unions would then be permitted to pass any such future assessments as long as those funds built in the most minute chargeable cushion, a cushion that is, from a practical perspective, almost inevitable. Without repercussion, Unions would be free to, even if inadvertently, trample on the First Amendment rights of dissenters.

This strategy must fail. Even if every cent of the assessment was not intended to be used for entirely political purposes, it is clear that the Union's intent was to depart drastically from its typical spending regime and to focus on activities that were political or ideological in nature.
///

18

This shift represents a material difference from that contemplated under the standard dues structure to which the 2005 <u>Hudson</u> Notice was directed and rendered the <u>Hudson</u> notice obsolete as to that Assessment.

Defendants adamantly object to being required to provide a second Hudson notice.  Since they are required to base such notices on audited figures, they argue that it is impossible to provide an "advance" notice.  However, advance notice is exactly what Hudson requires.  It is an advance notice provided to nonunion employees so that they may make an informed decision as to whether or not they object to the use of their funds for political or ideological purposes.  The Supreme Court's recognition that these notices would necessarily depend on prior years' financials does not change the underlying function of the notice itself.

Defendants belabor the Supreme Court's nod to practicality in footnote 18 of the Hudson opinion.  The Court there stated, "We continue to recognize that there are practical reasons why '[a]bsolute precision' in the calculation of the charge to nonmembers cannot be 'expected or required.'"  Hudson at 307 n.18.  The Court went on, "Thus, for instance, the Union cannot be faulted for calculating its fee on the basis of its expenses during the preceding year."  Id.  At no point did the Court state that this procedure was the only constitutionally mandated manner in which to prepare a Hudson notice.  The Court simply noted that, in the case of an annual notice, it was understandable that the union relied on the prior year's figures.

///

19

1    Notably, however, there is at least some nexus between using

2    the whole of the prior year's expenditures as a benchmark for the

3    whole of anticipated current year's expenditures, which could

4    reasonably be expected to remain at a similar level.  In that

5    instance, the nonunion employee is being asked to compare one

6    year's apples to the next year's apples.  However, in the current

7    case, the nonunion employees were never given any opportunity to

8    make such an informed decision as to the Assessment.  Rather,

9    after implementing the increase, the Union took the position that

10   nonunion employees had already been given an opportunity to make

11   an informed decision as to the Assessment by means of the 2005

12   Hudson Notice.  The Union now turns a blind eye to the

13   inconsistency inherent in asking nonunion employees to compare

14   apples, in the form of the prior year's financials, to oranges,

15   in the form of a new Assessment, an Assessment which was not to

16   be utilized for Union operations, but was instead earmarked for

17   discrete political purposes.

18       Defendants' argument that it must rely on audited financial

19   figures which the Assessment has not yet generated is inapposite.

20   Defendants are correct that the Hudson Court stated "adequate

21   disclosure surely would include...verification by an independent

22   auditor."  Hudson at 307 n.18.  However, the Ninth Circuit has

23   held that "while a formal audit is not always required, the union

24   must provide a statement of its chargeable and nonchargeable

25   expenses, together with an independent verification that the

26   expenses were actually incurred."  Harik v. Cal. Teachers Ass'n,

27   326 F.3d 1042, 1046 (9th Cir. 2003).

28   ///

"This passage certainly indicates that, although the Union must provide a breakdown between chargeable and nonchargeable expenses, the audit does not verify that the allocation is correct, but that the expenses were indeed spent the way the Union claims."  Cummings v. Connell, 316 F.3d 886, 892 (9th Cir. 2003) (rejecting the claim that an allocation audit was required).  "What is required is a real independent verification of the financial data in question to make sure that expenditures are being made the way the union says they are."  Id. (quoting Prescott v. County of El Dorado, 177 F.3d 1102, 1107 (9th Cir. 1999), vacated and remanded on other grounds, 528 U.S. 1111 (2000), reinstated in relevant part, 204 F.3d 984 (9th Cir. 2000)).

Defendants had audited financials from the prior year from which they were able to construct the requisite 2005 Hudson Notice.  Those expenditures were not necessarily relevant, however, to allocations within the subsequent Assessment.  It was within the Union's purview to determine which additional expenditures were chargeable or nonchargeable.  See Harik at 1046.  It follows that it was up to the Union to determine the relevant major categories of expenses as well.  The auditor merely "make[s] sure that expenditures are being made the way the union says they are."  Prescott at 1107.  Therefore, the Union could have looked at the purpose of the Assessment and determined which of its major categories of expenses should be allocated to that fund.  Those figures had been audited based on the prior year's information, as is acceptable under Hudson.  The burden is on the Union to put forth the TYPE of relevant expenditures.

21

1  The Court's methodology provides the means by which the Union

2  could have met that burden by issuing a second, verified Hudson

3  notice, specific to the Assessment, without estimating exact

4  future revenue expenditures.

5       Ultimately, the crux of the analysis is "adequate

6  information."  The Supreme Court determined that, under the

7  Hudson facts, use of prior year's financials was "adequate."  See

8  Hudson at 307 n.18.  The Union's use of its financials was not

9  adequate here because the categories of expenses included in the

10 2005 Hudson Notice were not relevant to the purposes for which

11 the funds in the Assessment were to be used.  The Assessment,

12 even according to the Union's own statements, was always intended

13 to provide a stream of funds whose use departed drastically from

14 standard Union spending.

15      A contrary decision from the one reached today would allow

16 unions to run roughshod over dissenting nonmembers by imposing a

17 post-objection period, "almost" purely political assessment,

18 holding the funds hostage, and then using those funds, even if

19 temporarily, for impermissible purposes.

20      An advance reduction by the amount of the fair share

21 percentage in the 2005 Hudson Notice does not alter this

22 analysis.  As the Supreme Court has emphasized, "[A] remedy which

23 merely offers dissenters the possibility of a rebate does not

24 avoid the risk that dissenters' funds may be used temporarily for

25 an improper purpose."  Hudson at 305.

26 ///

27 ///

28 ///

22

1  "A forced exaction followed by a rebate equal to the amount

2  improperly expended is thus not a permissible response to the

3  nonunion employees' objections."  Hudson at 305-306.[8]

4      Regardless of whether couched in terms of the Constitution

5  or in terms of common sense, the 2005 Hudson Notice could not

6  possibly have supplied the requisite information with which

7  nonmembers could make an informed choice of whether or not to

8  object to the Assessment.  Accordingly, this Court finds that the

9  2005 Hudson Notice was inadequate to provide a basis for the

10 Union's Assessment.

11

12     **B.   New Notice is the Appropriate Remedy to Address the
           Harm to Plaintiffs as a Result of the Inadequate 2005
13         *Hudson* Notice**

14

15     "An inadequate notice gives fee payers insufficient

16 information with which to decide whether or not to object to

17 paying portions of the fee that are unrelated to representational

18 activities.  A new, conforming notice, with a renewed opportunity

19 for fee payers to object to paying nonchargeable amounts,

20 addresses that harm.

21

22     [8] Defendants' attempt to dismiss constitutional concerns
    because everything worked out in favor of the nonmember employees
23  after the fact is irrelevant.  The question is not whether, in
    retrospect, nonunion employees actually benefitted by being
24  "undercharged."  Rather, the question is whether those employees
    were provided the constitutionally required minimum information
25  to make a forward-looking decision.  They were not.
    Additionally, Defendants' argument hinges on the fact that the
26  chargeable funds expended overall increased.  However, the
    chargeable expenditures attributed to the Assessment were 27.35%
27  in 2005 and 18.77% in 2006, much lower than those attributed to
    the standard Union dues and fees.  Union's Opp'n to Pls.' Motion
28  for Summary Judgment, 12:13-15.

Following a new, conforming notice, fee payers could object, and objectors would be entitled to a refund of the nonchargeable portion of the fee, with interest." <u>Wagner</u> at 1041. "[B]ecause the injury that fee payers suffer from an inadequate <u>Hudson</u> notice is the lack of an informed <u>opportunity</u> to object, the proper remedy is for the union to issue proper notice and give another opportunity for objection." <u>Id</u>. at 1042 (emphasis in original). These objectors will be entitled to receive a refund, with interest, of the nonchargeable amount.[9] <u>See</u> <u>Id</u>. at 1043.

**C.   Summary of Resolution of Plaintiffs' Motion**

The 2005 <u>Hudson</u> Notice, which detailed expenditures regarding all Union activities, not just the limited activities to be covered by the Assessment, could, by no stretch of the imagination, have been applicable to this special fund. A second <u>Hudson</u> notice was required in the case of this Assessment, not because the 2005 <u>Hudson</u> Notice could not conceivably cover any assessment or dues increase, but because the actual notice in this case was inadequate to provide the requisite information regarding the specific Assessment. <u>See</u> <u>Hudson</u> at 307 ("[T]he original information given to the nonunion employees was inadequate.")

///

///

---

[9] The <u>Wagner</u> court considered it relevant that there was no evidence presented that the union had acted in bad faith. <u>Id</u>. at 1042. Since the same is true here, the Court need not engage in any further analysis on this point.

1    Defendants essentially rely on the argument that Hudson and
2   its progeny left them a convenient loophole, one which now allows
3   them to subvert the central protections Hudson is meant to
4   provide.   However, no self-asserted loophole will allow
5   Defendants to avoid the Constitution.   The Hudson Court
6   articulated the minimum protections required under the First
7   Amendment.   This Court will not undermine that interpretation by
8   allowing Defendants to hollowly assert that they adhered to
9   constitutional requirements by issuing a standard Hudson notice,
10  which, in actuality, failed to provide any "adequate explanation"
11  as to how the subsequent Assessment would be used.

12    Accordingly, Plaintiffs' Motion for Summary Judgment is
13  granted.   The Union shall issue a proper Hudson notice as to the
14  Assessment, with a renewed opportunity for nonmembers to object
15  to paying the nonchargeable portion of the fee.   The Union is
16  ordered to issue nonmembers who, pursuant to this proper notice,
17  object to the Assessment a refund, with interest, of that amount.
18  Wagner at 1043.

19

20  **II.   DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION**

21       **A.   Nonobjectors Did Not Consent to the Assessment by**
             **Failing to Object to 2005 *Hudson* Notice**
22

23    Defendants argue that nonobjectors have no claim against the
24  Union for the wrongful use of funds exacted from their paychecks
25  under the 2005 Hudson Notice since they did not object to that
26  Notice.   This is basically the same claim, though differently
27  dressed, that Defendants' raised in their already denied first
28  motion for summary judgment.

25

This Court need not address Defendants' argument that "silence equals consent" under the Constitution.  In order for the nonunion employees' failure to object to have any legal significance, the 2005 Hudson Notice must have been valid and sufficient to cover the Asessment.  See Wagner at 1043 ("Th[e] principle [that plaintiffs burden of objection attaches only on provision of proper notice] makes sense, for it would be unfair to require a nonmember to object when the nonmember has, as a matter of law, not been adequately informed of the facts."). Because this Court holds that the 2005 Hudson Notice was not adequate as to the Assessment, nonobjectors could not have legally consented to the relevant subsequent deductions. Defendants' Motion for Summary Adjudication as to the class of nonobjectors is denied.

**B.   Plaintiffs' Claims Are Limited to the Time Period Encompassed by the Union's 2005 *Hudson* Notice**

Defendants also argue that any alleged wrong that occurred due to the lack of an adequate Hudson notice was remedied when the Union issued its subsequent Hudson notice in June of 2006. See Wagner and discussion, supra.

Since the proper remedy for the current wrong is a new Hudson notice and since Plaintiffs have not challenged the adequacy of the Union's 2006 or 2007 Hudson notices, this Court agrees with Defendants that the only time period relevant to the current dispute is September 2005 through June 2006 (inclusive). Hence, Defendants' Motion for Summary Adjudication as to the relevant time period is granted.

**CONCLUSION**

Plaintiffs' Motion for Summary Judgment is GRANTED. Defendants are ordered to issue, within sixty (60) days following the date of this Order, a proper <u>Hudson</u> notice as to the 2005 Assessment, offering nonmembers a forty-five (45) day period in which to object.  The Union shall thereafter issue to those nonmembers who object to this new <u>Hudson</u> notice a refund of the nonchargeable portion of the Assessment.  Pursuant to 28 U.S.C. § 1961, the Union shall further issue to those nonmembers all interest accruing from the date(s) upon which nonchargeable deductions were taken.

Defendants' Motion for Summary Adjudication as to the nonobjector class is DENIED and Defendants' Motion asking the Court to limit the relevant time period to September 2005 through June 2006 (inclusive) is GRANTED.

The Clerk of the Court is directed to enter judgment in favor of Plaintiffs and close the file.

IT IS SO ORDERED.

Dated: March 27, 2008

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE

27