UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

DIANNE KNOX, et al., ON BEHALF OF
THEMSELVES AND THE CLASSES
THEY REPRESENT,

          Plaintiffs,

     v.

JOHN CHIANG, Controller, State of
California, et al.,

          Defendants.

No.  2:05-cv-02198-MCE-CKD

**MEMORANDUM AND ORDER**

     Through this action, Plaintiffs, state employees, sought redress from Defendants Controller of the State of California John Chiang ("the Controller") and Service Employees International Union, Local 1000 ("the Union" or "SEIU") (collectively "Defendants") for violations of Plaintiffs' First, Fifth and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983.  Plaintiffs alleged, and the Supreme Court of the United States ultimately held, that Defendants used Plaintiffs' monies to support political causes without satisfying constitutionally required procedural safeguards.

     Presently before the Court is Plaintiffs' Motion for Attorney's Fees and Expenses pursuant to 42 U.S.C. § 1988.  (Pls.' Mot. Att'y Fees, Jan. 2, 2013, ECF No. 192.)

///

1

1  Defendant SEIU filed a timely opposition to Plaintiffs' Motion (Def.'s Opp'n, Feb. 28,

2  2013, ECF No. 206) which the Controller joined (Joinder, Feb. 28, 2013, ECF No. 208).

3  Plaintiffs filed a reply (Pls.' Reply, March 14, 2013, ECF No. 210) and subsequently filed

4  a Notice of Partial Withdrawal of the request for expenses (Pls.' Notice, March 19, 2013,

5  ECF No. 212).

6       Also before the Court is Defendant SEIU's Motion for Clarification (ECF

7  No. 198).  Plaintiffs filed a timely response to the Motion for Clarification (Pls.' Response,

8  Jan. 25, 2013, ECF No. 202) and Defendant SEIU filed a Reply (Def.'s Reply, Jan. 31,

9  2013, ECF No. 203).[1]

10      For the reasons set forth below, Plaintiffs' Motion for Attorney's Fees and

11  Expenses is GRANTED, and Defendant SEIU's Motion for Clarification is also

12  GRANTED.

13

14                    **LEGAL BACKGROUND**[2]

15

16      Under California law, public-sector employees in a bargaining unit may decide by

17  majority vote to create an "agency shop" arrangement under which all the employees are

18  represented by a union selected by the majority.  Cal. Gov't Code § 3502.5(a) (2010).

19  While employees in the unit are not required to join the union, they must nevertheless

20  pay the union an annual fee to cover the cost of union services related to collective

21  bargaining (so-called chargeable expenses).  See Lehnert v. Ferris Faculty Ass'n,

22  500 U.S. 507, 524 (1991); Machinists v. Street, 367 U.S. 740, 760 (1961).  The Supreme

23  Court has recognized that such arrangements represent an "impingement" on the First

24  Amendment rights of nonmembers.

25  _____

26      [1] Because oral argument will not be of material assistance, the Court orders these matters
   submitted on the briefs.  E.D. Cal. Local R. 230(g).

27      [2] The following summary of the legal background of this case is taken, sometimes verbatim, from
   the Supreme Court's opinion in this case.  Knox v. Serv. Employees Int'l Union, Local 1000, 132 S. Ct.
28  2277, 2284-85 (2012).

1  Teachers v. Hudson, 475 U.S. 292, 307 n.20 (1986); see also Davenport v. Wash. Ed.

2  Ass'n, 551 U.S. 177, 181 (2007) ("[A]gency-shop arrangements in the public sector raise

3  First Amendment concerns because they force individuals to contribute money to unions

4  as a condition of government employment"); Street, 367 U.S. at 749 (union shop

5  presents First Amendment "questions of the utmost gravity").  Thus, in Abood v. Detroit

6  Bd. of Ed., 431 U.S. 209 (1977), the Supreme Court held that a public-sector union,

7  while permitted to bill nonmembers for chargeable expenses, may not require

8  nonmembers to fund its political and ideological projects.  In Hudson, the Court identified

9  procedural requirements that a union must meet to collect fees from nonmembers

10  without violating their rights.  475 U.S. at 302–11.  There, the Court also held that the

11  First Amendment does not permit a public-sector union to adopt procedures that have

12  the effect of requiring objecting nonmembers to lend the union money to be used for

13  political, ideological, and other purposes not germane to collective bargaining.  Id. at

14  305.  In the interest of administrative convenience, however, the Hudson Court

15  concluded that a union "cannot be faulted" for calculating the fee that nonmembers must

16  pay "on the basis of its expenses during the preceding year."  Id. at 307 n.18.

18  **FACTUAL AND PROCEDURAL BACKGROUND[3]**

20  In June 2005, Defendant SEIU sent out its regular Hudson notice informing

21  employees what the agency fee would be for the year ahead.  The notice set monthly

22  dues at 1% of an employee's gross monthly salary but capped monthly dues at $45.

23  Based on the most recently audited year, Defendant SEIU estimated that 56.35% of its

24  total expenditures in the coming year would be dedicated to chargeable collective-

25  bargaining activities.

26  ///

27  ───────────────

28  [3] The following recitation of facts is taken, sometimes verbatim, from the Supreme Court's opinion
in this case.  Knox, 132 S. Ct. at 2285-86 (internal citations omitted).

1  Thus, if a nonunion employee objected within 30 days to payment of the full amount of

2  union dues, the objecting employee was required to pay only 56.35% of total dues.

3  Defendant SEIU's notice also included a feature that was not present in Hudson:  The

4  notice stated that the agency fee was subject to increase at any time without further

5  notice.  During this time, the citizens of the State of California were engaged in a wide-

6  ranging political debate regarding state budget deficits and, in particular, the budget

7  consequences of growing compensation for public employees backed by powerful

8  public-sector unions.

9  On June 13, 2005, Governor Arnold Schwarzenegger called for a special election

10  to be held in November 2005 where voters would consider various ballot propositions

11  aimed at state-level structural reforms.  Two of the most controversial issues on the

12  ballot were Propositions 75 and 76.  Proposition 75 would have required unions to obtain

13  employees' affirmative consent before charging them fees to be used for political

14  purposes.  Proposition 76 would have limited state spending and would have given the

15  Governor the ability under some circumstances to reduce state appropriations for public-

16  employee compensation.  Defendant SEIU joined a coalition of public-sector unions in

17  vigorously opposing these measures.  Calling itself the "Alliance for a Better California,"

18  the group would eventually raise "more than $10 million, with almost all of it coming from

19  public employee unions, including $2.75 million from state worker unions, $4.7 million

20  from the California Teachers Association, and $700,000 from school workers unions."

21  On July 30, shortly after the end of the thirty-day objection period for the June

22  Hudson notice, Defendant SEIU proposed a temporary 25% increase in employee fees,

23  which it billed as an "Emergency Temporary Assessment to Build a Political Fight-Back

24  Fund."  The proposal stated that the money was needed to achieve the union's political

25  objectives, both in the special November 2005 election and in the November 2006

26  election.

27  ///

28  ///

4

1   According to the proposal, money in the Fight-Back Fund would be used for a broad

2   range of political expenses, including television and radio advertising, direct mail, voter

3   registration, voter education and get out the vote activities in work sites and in

4   communities across California.  The proposal specifically stated that "[t]he Fund will not

5   be used for regular costs of the union—such as office rent, staff salaries or routine

6   equipment replacement, etc."  It noted that "all other public worker unions are in the

7   process of raising the extraordinary funds needed to defeat the Governor."  And it

8   concluded: "Each of us must do our part to turn back these initiatives which would allow

9   the Governor to destroy our wages and benefits and even our jobs, and threaten the

10   well-being of all Californians."  On August 27, Defendant SEIU's General Council voted

11   to implement the proposal.

12      On August 31, Defendant SEIU sent out a letter addressed to "Local 1000

13   Members and Fair Share Fee Payers," announcing that, for a limited period, their fees

14   would be raised to 1.25% of gross monthly salary and the $45-per-month cap on regular

15   dues would not apply.  The letter explained that the union would use the fund to "defeat

16   Proposition 76 and Proposition 75 on November 8," and to "defeat another attack on [its]

17   pension plan" in June 2006.  The letter also informed employees that, in the following

18   year, the money would help "to elect a governor and a legislature who support public

19   employees and the services [they] provide."

20      After receiving this letter, one of the Plaintiffs in this case called Defendant SEIU's

21   offices to complain that the union was levying the special assessment for political

22   purposes without giving employees a fair opportunity to object.  One of Defendant

23   SEIU's area managers responded that "even if [the employee] objected to the payment

24   of the full agency fee, there was nothing he could do about the September increase for

25   the Assessment."  (ECF No. 139.)  "She also stated that 'we are in the fight of our lives,'

26   that the Assessment was needed, and that there was nothing that could be done to stop

27   the Union's expenditure of that Assessment for political purposes."  Id.

28   ///

1    As a consolation, however, those employees who had filed timely objections after the

2    regular June Hudson notice were required to pay only 56.35% of the temporary

3    increase.

4         Plaintiffs filed this class-action suit on behalf of 28,000 nonunion employees who

5    were forced to contribute money to the Political Fight-Back Fund.  On March 28, 2008,

6    this Court issued an order granting summary judgment to Plaintiffs, and granting in part

7    Defendants' cross-motion for partial summary judgment.  (Order, ECF No. 139.)

8    Defendants appealed, and the Ninth Circuit reversed and remanded.  628 F.3d 1115

9    (9th Cir. 2010).  In accordance with the Ninth Circuit's opinion, this Court then issued an

10   order denying Plaintiffs' motion for Summary Judgment and reversing the denial of

11   Defendant's partial motion for summary judgment.  (ECF No. 178.)  Plaintiffs then

12   appealed, and the Supreme Court of the United States granted certiorari.  131 S. Ct.

13   3061 (2011).  The Supreme Court reversed and remanded the Ninth Circuit's decision.

14   132 S. Ct. 2277, 2284 (2012).  The Ninth Circuit then vacated this Court's decision in its

15   entirety and remanded the case to this Court "for further proceedings consistent with the

16   Supreme Court's opinion."  (ECF No. 183.)  On December 4, 2012, this Court entered

17   judgment in favor of Plaintiffs and ordered that "Defendant SEIU shall refund to Plaintiffs

18   all monies exacted for the 'Emergency Temporary Assessment to Build a Political Fight-

19   Back Fund,' for the entirety of the period during which the assessment was exacted, plus

20   interest." (Order 2, ECF No. 190.)  Defendants now seek clarification of the Court's

21   December 4 Order.  (ECF No. 198.)  Specifically, Defendants ask the Court to clarify the

22   applicable interest rate for the prejudgment interest that Defendants must pay.  (Id.)

23   Plaintiffs ask that the Court award them their reasonable attorney's fees and expenses

24   (ECF No. 192).

25   ///

26   ///

27   ///

28   ///

6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**STANDARD**

## A.    Standard for Attorney's Fees

The Civil Rights Attorney's Fees Awards Act of 1976 permits the award of attorney's fees in civil rights actions.  42 U.S.C. § 1988.  The statute provides, in pertinent part: "In any action or proceeding to enforce a provision of [42 U.S.C. § 1983] . . . , the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."  42 U.S.C. § 1988(b).  A "prevailing party" under § 1988 is a party who "succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit."  Hensley v. Eckerhart, 461 U.S. 424, 433 (1983).  "Reasonableness" is the benchmark for attorney's fees awards under 42 U.S.C. § 1988.  42 U.S.C. § 1988(b); Hensley, 461 U.S. at 433.

The "reasonableness" determination is a two-step process.  First, the court should calculate a "lodestar" by "multiplying the number of hours reasonably spent on the litigation by a reasonable hourly rate."  McCown v. City of Fontana Fire Dep't, 565 F.3d 1097, 1102 (9th Cir. 2009).  The appropriate number of hours includes all time "reasonably expended in pursuit of the ultimate result achieved in the same manner that an attorney traditionally is compensated by a fee-paying client for all time reasonably expended on a matter."  Hensley, 461 U.S. at 431.  However, in calculating the lodestar, "the district court should exclude hours 'that are excessive, redundant, or otherwise unnecessary.'"  McCown, 565 F.3d at 1102.  Although district judges "need not, and should not, become green-eyeshade accountants,"  Fox v. Vice, 131 S. Ct. 2205, 2216 (2011), the court should provide some indication of how it arrived at its conclusions. See Moreno v. City of Sacramento, 534 F.3d 1106, 1111 (9th Cir. 2008) ("When the district court makes its award, it must explain how it came up with the amount."), Padgett v. Loventhal, 706 F.3d 1205, 2013 WL 491024, *2 (9th Cir. Feb.11, 2013) ("We have long held that district courts must show their work when calculating attorney's fees.").

1    As a general rule, in determining the lodestar figure, "the court should defer to the

2    winning lawyer's professional judgment as to how much time he was required to spend

3    on the case." Moreno, 534 F.3d at 1112.  However, the party seeking an award of

4    attorney's fees bears the burden of producing documentary evidence demonstrating "the

5    number of hours spent, and how it determined the hourly rate(s) requested." McCown,

6    565 F.3d at 1102.  Then the burden shifts to the opposing party to submit evidence

7    "challenging the accuracy and reasonableness of the hours charged or the facts

8    asserted by the prevailing party in its submitted affidavits." Ruff v. County of Kings, 700

9    F. Supp. 2d 1225, 1228 (E.D. Cal. 2010).

10         The second step of the "reasonableness" determination gives the court discretion

11   to adjust the lodestar figure upward or downward based on an evaluation of several

12   factors articulated by the Ninth Circuit in Kerr v. Screen Extras Guild, Inc., 526 F.2d 67

13   (9th Cir. 1975).  McGrath v. County of Nevada, 67 F.3d 248, 252 (9th Cir. 1995).  The

14   Kerr factors include:

15              (1) the time and labor required, (2) the novelty and difficulty of
              the questions involved, (3) the skill requisite to perform the
16              legal service properly, (4) the preclusion of other employment
              by the attorney due to acceptance of the case, (5) the
17              customary fee, (6) whether the fee is fixed or contingent,
              (7) time limitations imposed by the client or the
18              circumstances, (8) the amount involved and the results
              obtained, (9) the experience, reputation, and ability of the
19              attorneys, (10) the 'undesirability' of the case, (11) the nature
              and length of the professional relationship with the client, and
20              (12) awards in similar cases.

21   Kerr, 526 F.2d at 69-70; see also E.D. Cal. Local Rule 293(c) (identifying the same

22   factors as relevant).  However, the court should exclude from its consideration factors

23   that are irrelevant or already subsumed in the initial lodestar calculation.  McGrath,

24   67 F.3d at 252; see also Blum v. Stenson, 465 U.S. 886, 898-900 (1984) (concluding

25   that such factors as "novelty and complexity of the issues," "the special skill and

26   experience of counsel," and "the quality of representation" are generally subsumed

27   within the lodestar calculation).

28   ///

1   Because the lodestar figure is presumptively reasonable, "a multiplier may be used to

2   adjust the lodestar amount upward or downward only in rare and exceptional cases,

3   supported by both specific evidence on the record and detailed findings by the lower

4   courts that the lodestar amount is unreasonably low or unreasonably high."  Van Gerwen

5   v. Guarantee Mut. Life Co., 214 F.3d 1041, 1045 (9th Cir. 2000) (internal citations and

6   quotations omitted).

7

8        **B.      Standard for Prejudgment Interest**

9

10        28 U.S.C. § 1961 provides that "[i]nterest shall be allowed on any money

11   judgment in a civil case recovered in a district court."  28 U.S.C. § 1961(a).  "The Ninth

12   Circuit has not articulated the standard for awarding prejudgment interest in § 1983

13   cases."  Davis v. Prison Health Servs., C 09-2629 SI, 2012 WL 4462520, *6 (N.D. Cal.

14   Sept. 25, 2012) (citing Murphy v. City of Elko, 976 F. Supp. 1359, 1362 (D. Nev. 1997));

15   see also Ruff v. Cnty. of Kings, No. CV-F-05-631-OWW/GSA, 2009 WL 4572782 (E.D.

16   Cal. Nov. 30, 2009).  However, the Ninth Circuit has held that prejudgment interest is an

17   element of compensation and is not a penalty.  W. Pac. Fisheries, Inc. v. SS President

18   Grant, 730 F.2d 1280, 1288 (9th Cir. 1984).  "Whether interest will be awarded is a

19   question of fairness, lying within the court's sound discretion, to be answered by

20   balancing the equities."  Wessel v. Buhler, 437 F.2d 279, 284 (9th Cir. 1971).

21        Section 1961 provides that "such interest shall be calculated from the date of the

22   entry of the judgment, at a rate equal to the weekly average 1-year constant maturity

23   Treasury yield, as published by the Board of Governors of the Federal Reserve System,

24   for the calendar week preceding the date of the judgment."  28 U.S.C. § 1961(a).  This

25   interest rate applies to prejudgment interest, unless the court "finds, on substantial

26   evidence, that a different rate is appropriate."

27   ///

28   ///

1  Blanton v. Anzalone, 813 F.2d 1574, 1575 (9th Cir. 1987) (citing Blanton v. Anzalone,

2  760 F.2d 989 (9th Cir. 1985)); see also W. Pac. Fisheries, Inc., 730 F.2d at 1289

3  (requiring substantial evidence to support the district court's decision to depart from the

4  Treasury bill rate).  "'Substantial evidence' has been defined as 'such relevant evidence

5  as a reasonable mind might accept as adequate to support a conclusion.'"  Id. at 1576

6  (quoting Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1014 (9th Cir.

7  1985)).

8

9                                    **ANALYSIS**

10        **A.    Attorney's Fees**

11                **1.    Reasonable Hourly Rate**

12

13        In determining attorney's fees under § 1988, the district court "must strike a

14  balance between granting sufficient fees to attract qualified counsel to civil rights cases

15  and avoiding a windfall to counsel."  Moreno, 534 F.3d at 1111 (internal citations

16  omitted).  Reasonable attorney's fees are calculated according to the prevailing market

17  rate in the relevant legal community.  Blum, 465 U.S. at 895.  The "relevant legal

18  community" in the lodestar calculation is generally the forum in which the district court

19  sits.  Barjon v. Dalton, 132 F.3d 496, 500 (9th Cir. 1997).  However, there is a narrow

20  exception allowing the court to rely on rates outside the local forum when the plaintiff

21  establishes that "local counsel was unavailable, either because they are unwilling or

22  unable to perform because they lack the degree of experience, expertise, or

23  specialization required to handle properly the case."  Id.

24        Here, Plaintiffs state that although this Court sits in Sacramento, "the 'relevant

25  legal community' for the purpose of calculating [Plaintiffs'] counsel's rates could . . . be

26  San Francisco, rather than Sacramento."  (ECF No. 192 at 10.)

27  ///

28  ///

1  Plaintiffs contend that San Francisco rates "could" apply because the claims raised in

2  this case are unique, and there is an "apparent lack of Sacramento attorneys and firms .

3  . . experienced and capable enough, and willing to undertake the case . . . ." (ECF No.

4  192 at 10.)  To support this contention, Plaintiffs submit the declaration of Steven

5  Burlingham, a Sacramento attorney.  Mr. Burlingham states that it is "doubtful that any

6  (perhaps one or two) local Sacramento attorneys would be willing to take on and pursue

7  such a case, given the substantial resources involved, the necessary expenditures of

8  time, and because they lack the degree of experience, expertise, or specialization

9  required to handle properly the case."  (ECF No. 192-2 at 49.)

10       This evidence is inadequate to support a finding that San Francisco rates, rather

11  than Sacramento rates, apply.  The only exception to the "local forum" rule applies to

12  situations in which a plaintiff demonstrates that the unavailability of local counsel caused

13  Plaintiff to retain an out-of-area attorney.  Barjon, 132 F.3d at 500.  The argument that

14  "perhaps one or two local Sacramento attorneys" would have been willing to take on the

15  case does not demonstrate that local counsel was unavailable.  To the contrary, this

16  statement suggests to the Court that there were Sacramento attorneys, albeit few, who

17  would have been willing to take this case.

18       Furthermore, Plaintiffs bear the burden of demonstrating that San Francisco rates

19  apply.  Here, Plaintiffs make no clear connection to San Francisco as the relevant legal

20  community—Plaintiffs' attorneys are from Virginia, and this case was litigated primarily in

21  Sacramento.  (See ECF No. 192-1, 192-2.)  Accordingly, the Court finds that the relevant

22  legal community is Sacramento.

23       The Court must next determine the reasonable hourly rate.  The reasonable

24  hourly rate "is not made by reference to rates actually charged by the prevailing party."

25  Chalmers v. City of L.A., 796 F.2d 1205, 1210 (9th Cir. 1986).  Instead, the court should

26  use the prevailing market rate in the community for similar services of lawyers "of

27  reasonably comparable skill, experience, and reputation."  Id. at 1210–11.

28  ///

Accordingly, in this case, the Court will apply the the prevailing market rate for a civil rights attorney practicing in the Sacramento area.  See Taylor v. Chaing, 2009 WL 453050, at *9 (E.D. Cal. Feb. 23, 2009) ("The rate to be applied is that of plaintiffs' counsel in the Sacramento area who engage in civil rights actions against governmental entities."); H.W. v. E. Sierra Unified School Dist., 2012 WL 4469262, at *2 (E.D. Cal. Sept. 27, 2012) ("The rate to be applied is that of . . . counsel in the Sacramento area who engage in civil rights actions.").  The court may use either current or historical prevailing market rates.  Schwarz v. Sec'y of Health & Human Servs., 73 F.3d 895, 908 (9th Cir. 1995) (internal citation omitted); see also Barjon, 132 F.3d at 502-03 ("[T]he district court may choose to apply either the attorney's current rates to all hours billed or the attorney's historic rates plus interest."); In re Wash. Pub. Power Supply Sys. Sec. Litig., 19 F.3d 1291, 1305 (9th Cir. 1994) ("Full compensation requires charging current rates for all work done during the litigation, or by using historical rates enhanced by an interest factor.").

     The fee applicant bears the burden of demonstrating that "the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."  Camacho v. Bridgeport Fin., Inc., 523 F.3d 973, 980 (9th Cir. 2008) (citation omitted).  "[A]ffidavits of the plaintiffs' attorneys and other attorneys regarding prevailing fees in the community . . . are satisfactory evidence of the prevailing market rate" but "do not conclusively establish the prevailing market rate."  Id.  In addition to considering affidavits and evidence submitted by the parties, the court may also "rely on its own familiarity with the legal market."  Ingram v. Oroudjian, 647 F.3d 925, 928 (9th Cir. 2011).

///

///

///

///

///

1    Plaintiffs' calculations of their attorney's fees are based on the following hourly

2    rates: (1) W. James Young- $500; (2) Raymond J. LaJeunesse, Jr.- $500; (3) Milton L.

3    Chappell- $500; (4) Bruce N. Cameron- $500; (5) Glenn M. Taubman- $500;

4    (6) William L. Messenger- $350.[4]

5        Mr. Young

6    The Court's own research reveals that the prevailing hourly rate for experienced

7    civil rights attorneys practicing in the Sacramento area does not exceed $400.[5]  See,

8    e.g., Lehr v. City of Sacramento, 2:07-CV-01565-MCE, 2013 WL 1326546 (E.D. Cal.

9    Apr. 2, 2013) (awarding hourly rate of $400 per hour for one of Sacramento's most

10   experienced and successful civil rights attorneys); H.W. v. E. Sierra Unified Sch. Dist.,

11   No. 2:11cv-00531 GEB GGH, 2012 WL 4469262, *1-2 (E.D. Cal. Sep. 27, 2012)

12   (concluding that requested hourly rate of $375 per hour was reasonable rate for

13   attorneys practicing civil rights litigation in Sacramento area); Jones v. Cnty. of

14   Sacramento, No. 2:09-CV-01025-DAD, 2011 WL 3584332, *9 (E.D. Cal. Aug. 12, 2011)

15   (concluding that hourly rate of $350 requested in civil rights case by attorney with over

16   35 years of litigation experience was "in line with those prevailing in the Sacramento

17   market for similar services by lawyers of reasonably comparable skills, experience and

18   reputation"); Cosby v. Autozone, Inc., No. 2:08-CV-00505-LKK-DAD, 2010 WL 5232992,

19   *3 (E.D. Cal. Dec. 16, 2010) (finding that $375 per hour was prevailing Sacramento rate

20   for experienced attorneys litigating cases under California's Fair Employment and

21   Housing Act and finding requested fees of $400 and $450 per hour excessive);

22   ///

23   ///

24

25       [4] These rates are the Sacramento rates requested by Plaintiffs.  Plaintiffs request alternative
     San Francisco rates, which the Court will not consider as Sacramento is the relevant legal community.

26   See supra.

27       [5] In conducting its research, the Court has paid particular attention to cases decided within two
     years of the time when Plaintiffs' attorneys began their work in this case.  See Bell v. Clackamas Cnty.,
     341 F.3d 858, 869 (9th Cir. 2003) (holding that it was an abuse of discretion for the district court "to apply

28   market rates in effect more than two years before the work was performed.").

1  Friedman v. Cal. State Employee Ass'n, No. 2:00-CV-00101-WBS-DAD, 2010 WL

2  2880148, *4 (E.D. Cal. July 21, 2010) (finding $275 per hour reasonable rate for

3  Sacramento civil rights attorneys); Beecham v. City of W. Sacramento,

4  No. 2:07-CV-01115-JAM-EFB, 2009 WL 3824793, *4 (E.D. Cal. Nov. 16, 2009) (finding

5  that $375 per hour was prevailing market rate charged by Sacramento attorneys in civil

6  right case and refusing to award requested $525–$550 per hour fee); Cal. Pro–Life

7  Council, Inc. v. Randolph, No. 2:00-CV-01698-FCD-GGH, 2008 WL 4453627, *4-5 (E.D.

8  Cal. Sept. 30, 2008) (finding hourly rate of $385 for lead trial counsel in civil rights case

9  reasonable for Sacramento market).

10       The Court finds that several factors must be taken into consideration in

11  determining Mr. Young's hourly rate.  First, Mr. Young is an experienced and successful

12  attorney in the areas of labor and constitutional law and successfully argued this case

13  before the United States Supreme Court.  (See Decl. W. James Young, ECF No. 192-1.)

14  Furthermore, this case presented novel and complex issues.  Thus, the Court will use

15  the hourly rate at the top of the compensation range that exists in the Sacramento legal

16  market for the purpose of calculating Mr. Young's fees.  The Court finds that

17  reimbursement at the rate of $450 per hour is appropriate for the work performed by

18  Mr. Young in this case.

19       Mr. LaJeunesse

20       Mr. LaJeunesse has submitted a declaration stating that he has been practicing

21  employment law since 1971, when he joined the National Right to Work Legal Defense

22  Foundation (Decl. Raymond LaJeunesse, Jr. 23, ECF No. 192-2.)  Like Mr. Young,

23  Mr. LaJeunesse has extensive experience with trial and appellate litigation in the areas

24  of labor and constitutional law, in both state and federal court.  (ECF No. 192-2 at

25  23-24.)  Because Mr. LaJeunesse's skills and experience and the quality of his work in

26  this case are comparable to those of Mr. Young, the Court finds that the rate of $450 per

27  hour is also a reasonable rate for Mr. LaJeunesse.

28  ///

1          Mr. Chappell

2          Mr. Chappell's declaration states that he began practicing as a staff attorney with

3    the National Right to Work Legal Defense Foundation upon his graduation from law

4    school and admission to the Maryland bar in 1976.  (Decl. Milton Chappell 29, ECF

5    No. 192-2.)  He has therefore worked as a staff attorney for the Foundation, and

6    practiced employment law, for nearly thirty-seven years.  Mr. Chappell also has

7    extensive experience with trial and appellate litigation in the areas of labor and

8    constitutional law, and has been lead counsel for cases before state and federal courts,

9    as well as state labor boards.  (Id. at 30.)  Because Mr. Chappell's skills and experience

10   and the quality of his work in this case are comparable to the skills of experience of both

11   Mr. Young and Mr. LaJeunesse, the Court finds that the rate of $450 per hour is also

12   reasonable for Mr. Chappell.

13         Mr. Cameron

14         Mr. Cameron is the Reed Larson Professor of Labor Law and Regent University

15   School of Law and is on staff with the National Right to Work Legal Defense Foundation.

16   (Decl. Bruce Cameron 34, ECF No. 192-2.)  Mr. Cameron has been part of the

17   Foundation's litigation staff since 1976.  (Id. at 35.)  Thus, like Mr. Chappell,

18   Mr. Cameron has practiced labor and constitutional law for nearly thirty-seven years.

19   Like Messrs. Chappell, LaJeunesse and Young, Mr. Cameron has extensive experience

20   with trial and appellate litigation in employment law cases in both state and federal court.

21   (ECF No. 192-2 at 35.)  Because Mr. Cameron's skills and experience and the quality of

22   his work in this case are comparable to those of his colleagues in this case, the Court

23   finds that the rate of $450 per hour is reasonable for Mr. Cameron.

24         Mr. Taubman

25         Mr. Taubman graduated from Emory Law School in 1980 and received an LLM in

26   Labor Law from Georgetown University Law Center in 1985.  Mr. Taubman has been

27   employed as a staff attorney at the National Right to Work Legal Defense Foundation

28   since 1982.  (Decl. Glenn Taubman 39, ECF No. 192-2.)

1    Mr. Taubman has therefore practiced labor law for nearly thirty-two years.  Like his

2    colleagues in this case, Mr. Taubman has practiced as both a trial and appellate attorney

3    in the areas of labor and constitutional law, in both state and federal courts, as well as

4    before state labor boards and the National Labor Relations Board.  (Id. at 39-40.)  Thus,

5    Mr. Taubman's skill and experience and the quality of his work in this case are

6    comparable to the skills of his colleagues, listed above.  As such, the Court finds that a

7    rate of $450 per hour is reasonable for Mr. Taubman.

8           Mr. Messenger

9           Mr. Messenger graduated from George Washington University School of Law in

10   2001.  (Decl. William Messenger 44, ECF No. 192-2.)  Upon graduation, Mr. Messenger

11   became employed as a staff attorney with the Foundation.  (Id.)  Thus, Mr. Messenger

12   has eleven years of experience in labor litigation.  As a staff attorney for the Foundation,

13   Mr. Messenger has practiced as both a trial and appellate attorney in the areas of labor

14   and constitutional law.  Mr. Messenger has acted, or is currently acting, as lead trial

15   and/or appellate counsel in at least ten cases.  (Id. at 45.)  Mr. Messenger has also been

16   lead or co-counsel in other cases in state and federal courts, as well as before the

17   National Labor Relations Board.  (Id.)  Mr. Messenger asks that he be reimbursed at a

18   rate of $350 per hour.  (Id. at 46.)

19          However, the Court's research reveals that a prevailing rate in the Sacramento

20   market for the services of an attorney with skills, experience and reputation similar to

21   those of Mr. Messenger does not exceed $260 per hour.  See, e.g., Lehr v. City of

22   Sacramento, 2013 WL 1326546, at *8 (finding $260 per hour was Sacramento market

23   rate for civil rights attorney with 7-10 years of experience); Jones, 2011 WL 3584332, at

24   *9-10 (finding $250 per hour was Sacramento market rate for a civil rights attorney with

25   roughly ten years of litigation experience); Cal. Pro-Life Council, Inc., 2008 WL 4453627,

26   at *4-7 (using $230 to $260 per hour as a reasonable rate for junior partners practicing in

27   the Sacramento area).  Accordingly, the Court calculates Mr. Messenger's attorney's fee

28   award based on the rate of $260 per hour.

1                    **2.**      **Additional Attorney's Fees Awards**

2

3         Plaintiffs enlisted the services of Neal K. Katyal and his firm Hogan Lovells US,

4 LLP, exclusively for the litigation before the Supreme Court.  Plaintiffs seek

5 compensation for Mr. Katyal and Mr. Katyal's colleagues at Hogan Lovells at a flat rate

6 of $95,000.  According to Mr. Katyal's declaration, his normal hourly rate is $1,190.  His

7 colleagues Dominic F. Perella, Catherine Stetson, and Jessica Ellsworth have normal

8 hourly rates of $565, $750 and $630, respectively.  Plaintiffs assert that the total lodestar

9 for the hours worked by these attorneys alone is $145,669.  However, because Hogan

10 Lovells took on the case at a reduced rate due to the case's public-interest nature,

11 Plaintiffs seek only to be reimbursed a flat rate of $95,000 for the work performed by

12 Hogan Lovells.  Defendants do not contest the flat fee of $95,000.  Accordingly, the

13 Court finds that the $95,000 flat fee sought by counsel for Hogan Lovells is a reasonable

14 and appropriate award in this case.

15         Plaintiffs also enlisted the services of Steven Burlingham.   Mr. Burlingham is a

16 Sacramento attorney who has been practicing in Sacramento since 1979.  (ECF

17 No. 192-2 at 48.)  Mr. Burlingham attaches the billing statements, showing the services

18 he performed in this case in his capacity as Plaintiffs' local counsel.  Mr. Burlingham

19 seeks compensation in the amount of $303.50.  These records show that Mr. Burlingham

20 made calls, sent emails, and participated in conferences with opposing counsel.

21 Mr. Burlingham also answered calls from the Court regarding motions and stipulations.

22 Mr. Burlingham submits documentation showing the following invoices:

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

| | |
|---|---|
| Numerous calls and email from right to work (<u>Knox. v. Westly</u>) and copies made | $55.00 |
| Call from Attorney Jeff Demain (<u>Knox v. Westly</u>) for information; e-filing and calls to e-filing | $55.00 |
| <u>Knox v. Wesley</u> [sic]: Telephone message from and conference with opposing counsel; review confirming letter | $85.50 |
| Call from Court re: wrong date for summary judgment (<u>Knox v. Wesley</u> [sic]); call right to work to inform | $24.00 |
| Call from Court re emailing stipulation for judge's signature and call Laverne to inform (<u>Knox v. Westley</u>) | $24.00 |
| Telephone conference re: appearance for Knox v. Chang [sic] | $60.00 |
| Total sought: | $303.50 |

Defendants do not dispute the $303.50 sought by Mr. Burlingham.  The Court finds it somewhat problematic that Mr. Burlingham provides no evidence of the time expended in making these phone calls and emails, or how the rates charged were arrived at—whether they are flat rates or an hourly rate, and what the applicable hourly rate is (if any).  However, in light of the amount sought and the amount of work performed, the Court finds Mr. Burlingham's requested attorney's fee of $303.50 reasonable.  As such, Plaintiffs are entitled to reimbursement for this amount.

### 3.      Reduction for Unsuccessful Motion

In addition to arguing that Defendants violated nonmembers' constitutional rights, Plaintiffs' Complaint asserted that Defendant SEIU violated the Constitution by causing deductions to be made for the temporary dues and fees increase from the salaries of <u>members</u> of the Union.  Defendant SEIU moved for judgment on the pleadings ("MJOP") as to Plaintiffs' claim on behalf of union members.

///

18

1    The Court granted Defendant SEIU's motion and held that Plaintiffs could not bring any

2    cognizable constitutional claim on behalf of union members because there is no state

3    action involved in the payment of union dues.

4         Defendants[6] now argue that the compensation requested by Plaintiffs for the 10.5

5    hours of Mr. Young's time spent working on Plaintiffs' Opposition to Defendant SEIU's

6    Motion for Judgment on the Pleadings should be denied.  Likewise, Defendants argue

7    that the compensation requested by Plaintiffs for the 29.50 hours of Mr. Young's time

8    spent working on discovery related to that motion should be denied.  Finally, Defendants

9    contend that the Court should deny Plaintiffs' request for the $1,978.11 incurred in out-

10   of-pocket expenses with regard to that discovery.

11        The law is clear that "[w]here the plaintiff has failed to prevail on a claim that is

12   distinct in all respects from his successful claims, the hours spent on the unsuccessful

13   claim should be excluded in considering the amount of a reasonable fee."  Hensley v.

14   Exkerhart, 461 U.S. 424, 440 (1983).  Thus, Plaintiffs agree that the 10.5 hours

15   expended on the Opposition are properly excluded, but maintain that Plaintiffs are

16   entitled to reimbursement for the fees and expenses related to the MJOP discovery.

17        First, Plaintiffs contend that as a matter of procedure, Defendants waived the right

18   to dispute compensation for the fees and expenses related to the MJOP when

19   Defendants failed to object to the bill of costs submitted by Plaintiffs, which included

20   costs for the deposition transcript.  (ECF No. 210 at 11.)  The Court finds that

21   Defendants did indeed waive their right to challenge costs associated with the MJOP.

22   See, e.g., Konig v. Dal Cerro, No. C 04-02210 WHA, 2008 WL 4628038, *2 (N.D. Cal.

23   Oct. 16, 2008) (citing In re Paoli R.R. Yard DPIB Litig., 221 F.3d 449, 453 (3d Cir.

24   2000)).  But failure to object to the bill of costs does not waive Defendants' right to

25   challenge Plaintiffs' claim for compensation for the hours and expenses related to the

26   MJOP.  Plaintiffs cite to no authority providing that a failure to file an objection to the bill

27        _____

          [6] Although Defendant SEIU filed the Opposition to Plaintiffs' Motion for Attorney's Fees (ECF

28   No. 206), Defendant Controller filed a Joinder (ECF No. 208).  Accordingly, the Court refers to
     "Defendants" throughout.

1    of costs is tantamount to waiver of the right to object to attorney's fees for that particular

2    item, and the Court is aware of none.  Thus, the Court cannot find that Defendants

3    waived the right to dispute Plaintiffs' compensation for these fees as a procedural matter.

4         Accordingly, the Court must examine whether, as a substantive matter, Plaintiffs

5    are entitled to these fees and expenses.  The Supreme Court has made clear that

6    "plaintiffs may receive fees under § 1988 even if they are not victorious on every claim.

7    A civil rights plaintiff who obtains meaningful relief has corrected a violation of federal

8    law and, in so doing, has vindicated Congress's statutory purposes.  That 'result is what

9    matters . . . .'" Fox v. Vice, 131 S. Ct. 2205, 2214 (2011) (quoting Hensley v. Eckerhart,

10   461 U.S. 424, 435 (1983)).  Thus, "[a] court should compensate the plaintiff for the time

11   his attorney reasonably spent in achieving the favorable outcome, even if 'the plaintiff

12   failed to prevail on every contention.'" Id. (citing Hensley, 461 U.S. at 435).  Indeed,

13   "attorney work will [often] bear on multiple claims, only some of which are successful.

14   Fees for work which relates only to unsuccessful claims should not be awarded."

15   Padgett v. Loventhal, 706 F.3d 1205, 1209 (9th Cir. 2013) (citing Hensley, 461 U.S. at

16   436).  "[T]he presence of these unsuccessful claims does not immunize a defendant

17   against paying for the attorney's fees that the plaintiff reasonably incurred in remedying

18   a breach of his civil rights." Fox, 131 S. Ct. at 2214.  The award of attorney's fees

19   "should not reimburse the plaintiff for work performed on claims that bore no relation to

20   the grant of relief:  Such work 'cannot be deemed to have been expended in pursuit of

21   the ultimate result achieved.'" Fox, 131 S. Ct. at 2214 (quoting Hensley, 461 U.S. at

22   435)).  However, "where attorney work proves beneficial to a successful claim, district

23   courts should generally award these fees in full, even if the work is also useful to an

24   unsuccessful claim.  In other words, the district court must award fees for the work that

25   contributed to a successful result as if the successful claims were the only ones

26   litigated." Padgett, 706 F.3d at 1209.

27        The Ninth Circuit has developed a two-part analysis to determine when a plaintiff

28   may recover attorney's fees for unsuccessful claims.

> First, the court asks whether the claims upon which the plaintiff failed to prevail were related to the plaintiff's successful claims. If unrelated, the final fee award may not include time expended on the unsuccessful claims. If the unsuccessful and successful claims are related, then the court must apply the second part of the analysis, in which the court evaluates the 'significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.' If the plaintiff obtained 'excellent results,' full compensation may be appropriate, but if only 'partial or limited success' was obtained, full compensation may be excessive. Such decisions are within the district court's discretion.

Banta v. City of Merrill, CIV. 06-3003-CL, 2007 WL 3543445, *3 (D. Or. Nov. 14, 2007) (citing Thorne v. City of El Segundo, 802 F.2d 1131, 1142 (9th Cir. 1986)). Unrelated claims are "distinctly different" and based on different facts and legal theories, while related claims "involve a common core of facts or [are] based on related legal theories." Banta, 2007 WL 3543445, at *3 (quoting Hensley, 461 U.S. at 434-35, 437 n.12). In other words, "the test is whether relief sought on the unsuccessful claim is intended to remedy a course of conduct entirely distinct and separate from the course of conduct that gave rise to the injury on which the relief granted is premised. Thus, the focus is to be on whether the unsuccessful and successful claims arose out of the same conduct." Schwarz v. Sec'y of Health & Human Servs., 73 F.3d 895, 901, 903 (9th Cir. 1995) (quoting Thorne, 802 F.2d at 1141).

Here, the Court cannot say that Plaintiffs' unsuccessful claim, brought on behalf of Plaintiff Conover—a member of Defendant SEIU at the time the special assessment was levied—was intended to remedy a course of conduct "entirely distinct and separate from the course of conduct that gave rise to the injury on which the relief granted is premised." Schwarz, 73 F.3d at 901. The non-union Plaintiffs asserted that Defendant SEIU failed to give them an adequate opportunity to object to the assessment, as constitutionally required. Plaintiff Conover, on the other hand, asserted that Defendant SEIU failed to give him an adequate opportunity to resign from the Union and, as a non-member, to object to the fee increase.

///

1  Thus, Plaintiffs' successful and unsuccessful claims each relate to Defendant SEIU's

2  conduct in levying the special assessment and the opportunity (of both members and

3  nonmembers) to object to the assessment.  As such, these claims arise out of the same

4  conduct and therefore are related for the purposes of determining whether Plaintiffs may

5  recover fees related to their unsuccessful claim.

6  Next, the Court must assess "the significance of the overall relief obtained by the

7  plaintiff in relation to the hours reasonably expended on the litigation.  If the plaintiff

8  obtained 'excellent results,' full compensation may be appropriate."  Banta, 2007 WL

9  3543445, at *3 (citing Thorne, 802 F.2d at 1142).  Here, Plaintiffs achieved excellent

10  results.  Plaintiffs successfully litigated their claims up to the Supreme Court, and the

11  Supreme Court found that Defendant SEIU's Hudson notice was indeed constitutionally

12  deficient, in violation of Plaintiffs' First Amendment rights.  Knox, 132 S. Ct. 2277.

13  Furthermore, there is no showing that Plaintiffs expended an unreasonable amount of

14  hours in obtaining this result.  Accordingly, full compensation for the hours expended on

15  litigating Plaintiffs' unsuccessful claim is appropriate.  See Banta, 2007 WL 3543445, at

16  *3 (citing Thorne, 802 F.2d at 1142).

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

### 4. Lodestar

For the reasons stated above, the Court calculates Plaintiffs' lodestar as follows:

| Attorney | Total Hours | Hours Claimed | Awarded Hourly Rate | Awarded Lodestar |
|---|---|---|---|---|
| Mr. Young | 1771.45 | 1699.65[7] | $450 | $764,842.50 |
| Mr. LaJeunesse | 83.00 | 71.40 | $450 | $32,130.00 |
| Mr. Chappell | 145.10 | 124.40 | $450 | $55,980.00 |
| Mr. Cameron | 53.00 | 51.60 | $450 | $23,220.00 |
| Mr. Taubman | 75.00 | 70.00 | $450 | $31,500.00 |
| Mr. Messenger | 70.00 | 70.00 | $260 | $18,200.00 |
| Richard J. Clair[8] | 18.70 | 0.00 | n/a | $0.00 |
| John C. Scully | 7.50 | 0.00 | n/a | $0.00 |
| Sarah E. Hartsfield | 64.25 | 0.00 | n/a | $0.00 |
| **Additional Amounts** | | | | |
| Hogan Lovells Counsel | | | $95,000.00 | $95,000.00 |
| Mr. Burlingham | | | $303.50 | $303.50 |
| **Total Awarded Lodestar: $1,021,176.00** | | | | |

Thus, the Court finds that the appropriate lodestar in this case, based on the awarded hourly rates, is $1,021,176.00.  Plaintiffs do not request a multiplier or suggest that the Kerr factors require any upward adjustment.  See 526 F.2d 67.

---

[7] This number is calculated as the initial amount of hours claims by Mr. Young (1,625.65) minus the 10.5 hours excluded for the MJOP, plus the 34.3 hours spent in preparing Plaintiffs' Reply, plus the 50.2 hours spent preparing Plaintiffs' Opposition to Defendant SEIU's Motion for Clarification.  (See ECF No. 210-4.)

[8] Plaintiffs state that they do not seek compensation for Mr. Clair, Mr. Scully, or Ms. Hartsfield, but have included the hours relating to these individuals to provide the Court with a thorough accounting. (ECF No. 192 at 14.)  These attorneys assisted in preparing for, and attended, moot courts.  (Id.)

1   Furthermore, the lodestar figure is presumptively reasonable, and thus a multiplier

2   should be used "only in rare and exceptional cases." <u>Van Gerwen</u>, 214 F.3d at 1045.

3   Thus, the Court finds that the lodestar amount is the total compensable attorney's fees in

4   this case.

5

6               **5.      Expenses**

7

8          "Under § 1988, the prevailing party may recover as part of the award of attorney's

9   fees those out-of-pocket expenses that would normally be charged to a fee paying

10  client." <u>Dang</u>, 422 F.3d at 814 (internal citations and quotations omitted).  "Such out-of-

11  pocket expenses are recoverable when reasonable."  <u>Id.</u>

12         Plaintiffs seek reimbursement of $15,412.93 in out-of-pocket expenses incurred in

13  litigating this case.  (ECF No. 192 at 16.)  While Defendants argue that Plaintiffs are not

14  entitled to the $1,978.11 in out-of-pocket expenses spent in relation to the MJOP, the

15  Court finds that Plaintiffs are entitled to these expenses because the claim litigated in the

16  MJOP is related to Plaintiffs' successful claims. <u>See</u> <u>supra</u>.  Accordingly, the Court finds

17  that the expenses and costs sought by Plaintiffs to be reasonable and awards Plaintiffs

18  $15,412.93 in out-of-pocket expenses.

19

20         **B.      Prejudgment Interest**

21

22         As set forth above, the Court issued an order on December 4, 2012, stating that

23  "Defendant SEIU shall refund to Plaintiffs all monies exacted for the 'Emergency

24  Temporary Assessment to Build a Political Fight-Back Fund," for the entirety of the

25  period during which the assessment was exacted, plus interest."  (ECF No. 190 at 2.)

26  Defendants and Plaintiffs disagree about the applicable prejudgment interest rate.

27  ///

28  ///

1   Further, the Court's prior order, dated March 28, 2008, stated: "[p]ursuant to 28 U.S.C.

2   § 1961, the Union shall further issue to those nonmembers all interest accruing from the

3   date(s) upon which nonchargeable deductions were taken."  (ECF No. 139 at 27.)

4        The Court now affirms its prior application of federal law to the prejudgment

5   interest rate in this case.  See, e.g., Ruff, 2009 WL 4572782, at *5-6 (applying § 1961

6   interest rate to § 1983 case); see also W. Pac. Fisheries, Inc., 730 F.2d at 1289 ("We

7   conclude that the measure of interest rates prescribed for post-judgment interest in

8   28 U.S.C. § 1961(a) is also appropriate for fixing the rate for pre-judgment interest in

9   cases such as this, where pre-judgment interest may be awarded, unless the trial judge

10   finds, on substantial evidence, that the equities of the particular case require a different

11   rate.")  As set forth above, under 28 U.S.C. § 1961(a), the applicable interest rate is "the

12   average accepted auction price for the last auction of fifty-two week United States

13   Treasury bills settled immediately prior to the date of judgment."  28 U.S.C. § 1961(a).

14   This rate may be found by referring to the Federal Reserve website, located at:

15   http://www.federalreserve.gov/RELEASES/h15/.

16        Under § 1961, the applicable interest rate in this case is .18%, which is the

17   Treasury bill ("T-Bill") rate for the week ending in November 30, 2012.  This interest rate

18   is exceptionally low, from both a historical perspective (see ECF No. 202-1 at 1-18

19   (setting forth monthly rates from 1953 through 2012)) and in contrast to the T-Bill rates

20   during the timespan of this case (see id.)  At the commencement of this case, the

21   monthly average rate was 3.85%.  (Id.)  The monthly average rate then peaked at 5.22%

22   in July 2006, and was 1.54% in March 2008, when this Court first entered judgment for

23   Plaintiffs.  (Id.)  In light of these facts, the Court finds that there is substantial evidence

24   that use of the .18% federal interest rate would, in effect, deny Plaintiffs prejudgment

25   interest, and the equities of this case require the application of the *monthly average*

26   T-Bill rate in effect at the time that each deduction was made, from September 2005 to

27   December 2006.

28   ///

See <u>Davis</u>, 2012 WL 4462520, at *6 (finding equities required award of higher rate when federal interest rate was .11%); <u>Ruff</u>, 2009 WL 4572782, at *6 (stating that under Ninth Circuit law, Court has discretion to apply the rate in effect at the time of the wrongful conduct).

**CONCLUSION**

For the reasons just stated, IT IS HEREBY ORDERED THAT:

1.    Plaintiffs' Motion for Attorney's Fees (ECF No. 192) is GRANTED;

2.    Plaintiffs are awarded attorney's fees in the amount of $1,021,176.00.

3.    Plaintiffs are awarded expenses in the amount of $15,412.93.

4.    Defendant SEIU's Motion for Clarification (ECF No. 198) is GRANTED;

5.    The rate of prejudgment interest to be applied is the monthly average Treasury bill rate in effect at the time that each nonchargeable deduction was made.

IT IS SO ORDERED.

DATED:  June 5, 2013

_____
MORRISON C. ENGLAND, JR., CHIEF JUDGE
UNITED STATES DISTRICT JUDGE